IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

John D. Rigsby,           :

    Plaintiff,         :

  v.                       :     Case No. 2:08-cv-0540

Michael J. Astrue,        :     JUDGE FROST
Commissioner of Social Security,   MAGISTRATE JUDGE KEMP
                          :
    Defendant.

REPORT AND RECOMMENDATION

I.  Introduction

    Plaintiff, John D. Rigsby, filed this action seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. His application, which was filed on July 10, 2001, alleged that plaintiff became disabled on November 29, 2000, as a result of multiple medical conditions. Plaintiff had previously been granted a period of disability and disability benefits from March 1996 to August 2000, when his disability was found to have ended.

    After initial administrative denials of his claim, plaintiff was afforded a hearing before an Administrative Law Judge on December 16, 2003. In a decision dated July 20, 2004, the Administrative Law Judge denied benefits. That decision became the final decision of the Commissioner when the Appeals Council denied review on December 21, 2004.

    Plaintiff thereafter timely commenced a civil action in this court seeking judicial review of the Commissioner's decision. *Rigsby v. Commissioner of Social Security,* No. 2:05-cv-135 (filed Feb. 11, 2005). Subsequently, the parties stipulated to a joint remand to the Appeals Council. The Appeals Council remanded the

case for further consideration on October 24, 2005 to evaluate plaintiff's residual functional capacity and to clarify the testimony of the medical expert and vocational expert to determine whether plaintiff could perform other work despite his impairments.

Plaintiff was afforded a supplemental hearing before an Administrative Law Judge on February 2, 2006. In a decision dated June 27, 2007, the Administrative Law Judge again denied benefits. That decision became the final decision of the Commissioner when the Appeals Council denied review on April 16, 2008.

Plaintiff thereafter timely commenced this civil action. The record of administrative proceedings was filed in this Court on August 12, 2008. Plaintiff filed a statement of errors on December 1, 2008, to which the Commissioner responded on February 2, 2009. The matter is now ripe for decision.

## II. Plaintiff's testimony

Plaintiff's testimony at the first administrative hearing revealed the following. Plaintiff, who was 37 years old at the time of that hearing, has a high school education. (Tr. 41). He lives with his wife and daughter. (Tr. 42). Plaintiff testified that he receives a small amount of income from insurance policy commission renewals. (Tr. 46).

Plaintiff testified that he has extensive joint pain, swelling in his legs and feet and pain in the middle of the arches of his feet which he believes are side effects of his medication. (Tr. 48). Plaintiff believes he could stand 10 minutes at a time and possibly a total of one to two hours in an eight-hour day. He said he could sit for 20 minutes at a time. (Tr. 49-50).

Plaintiff believes he is unable to work to due to, "Well, I can't - - in the mornings when I get up, I can't function. The

pain I have in my feet and my hips, mainly that's usually where it is, I just can't function, and I've tried, and I've even tried to get up and maybe act like I have a job, get dressed, go to town and just in my mind just try to do it, and I just can't - - couldn't do it. The pain that I have - - I mean, I go to put on my clothes and I'm swelling all over. I go to put on my shoes, and one they're fitting and the next day they're not, you know, and I've talked to my doctor about it. Dr. Lutmer, and I just ask him if there's medicine or anything that I could take to help me, and he said one day that, he just said your prognosis is worse than your diagnosis."

Plaintiff testified to his daily activities. He normally gets up around 7:00 or 8:00 a.m. He reads the newspaper or watches the news and sometimes will go visit his parents. He reads the Bible during the day and walks around his trailer. He takes two naps during the day for a total of 2 hours and goes to bed around 11:00 p.m. He tries to help his wife with the dishes, but can only do so for a short period of time because of hip pain. His brother helps him mow the grass because he can only ride his riding mower for a short period of time. He reads to his daughter. He goes to church Sunday morning and sometimes in the evenings visits his pastor for support. (Tr. 58-59).

Plaintiff also testified at the administrative hearing held on February 2, 2006. He said that the pain in his joints and feet had gotten worse the past couple of years. (Tr. 530). He had seen a lung specialist because he was having a hard time breathing and he now uses several medications as well as a machine to give himself a breathing treatment 10 to 12 times a week. (Tr. 533-34). Plaintiff further testified that he said he has to lie down three or four times a day because of pain in his hips, legs and feet. Id. He no longer dresses every day because of pain in his lungs and it takes too much out of him. (Tr. 535).

He does not go to church as often as he used to. (Tr. 535-36). He does fewer chores around the house and no longer mows his grass. (Tr. 536-37).

### III. The Medical Records

Pertinent medical records reveal the following. Plaintiff had developed end-stage renal disease and underwent a kidney/pancreas transplant in July 1996. He did well postoperatively, but continued to have recurrent and worsening cystitis and hematuria requiring transfusions. Plaintiff was hospitalized November 30, 2000 through December 6, 2000 for an enteric conversion of his pancreas transplant. (Tr. 175-90). When Plaintiff saw his surgeon, Dr. Henry, for follow up on February 26, 2001, Dr. Henry concluded that plaintiff had reasonable function status but noted that he complained of paresthesis in his hands and feet which could be due to medication. Dr. Henry also noted Plaintiff required treatment for recurrent pneumonia. (Tr. 197-98).

Plaintiff was seen by Dr. Lutmer, an internist, on a number of occasions from 2000 to 2003. In February 2001, it was noted that plaintiff suffered from swelling in his left calf, intermittent tingling in his hands and feet, and a persistent cough. In April 2001, plaintiff complained of pain in his left foot as well as right and left leg swelling. Weight bearing made the pain worse and his left toes were occasionally numb. Physical exam revealed swelling bilaterally in his lower extremities above the sock line. In May 2001, plaintiff complained of edema in his legs. Dr. Lutmer felt the complaints could be due to medication so he reduced his Norvasc. In July 2001, plaintiff stated he "hurts all over." Dr. Lutmer noted that "[t]his gentleman obviously has osteoporosis. He very well may be developing aseptic necrosis of the hips." (Tr. 229-70).

In August 2002, Dr. Lutmer noted that plaintiff still had

-4-

pain in the left inguinal region. An MRI of plaintiff's hips were normal. Dr. Lutmer believed plaintiff could have aseptic necrosis of the left hip and prescribed Prozac to try to help with pain control. In July 2003, Dr. Lutmer noted that he still has "horrible diffuse pain." Dr. Luther concluded, "I think he is obviously disabled. He has had a lot of medical problems. He can't work now and that is going through the process, but I would support that." (Tr. 321-38).

On April 16, 2001, Plaintiff was examined by a neurologist, Dr. Taylor, due to complaints of painful feet with burning in the soles of his feet associated with numbness. Following examination, Dr. Taylor's impression was distal painful neuropathy most likely secondary to a combination of diabetes and renal insufficiency. He started plaintiff on Neurontin, which is used to relieve neuropathic pain. (Tr. 225-26).

Plaintiff underwent a consultative examination in November 2001, which was conducted by Dr. Johnson. Plaintiff's complaints were related to his kidney/pancreas transplant and he reported a history of diabetes causing decreased peripheral vision. On examination, plaintiff had bilateral retinal scarring and an unsteady heel-to-toe test. Dr. Johnson diagnosed plaintiff with insulin dependent diabetes mellitus, status post kidney pancreas transplant, diabetic retinopathy, diabetic neuropathy, history of osteoporosis secondary to steroid use, exogenous obesity, hypertension, and chronic bronchitis. She concluded that plaintiff was capable of performing light work-related activities on a sustained basis. (Tr. 275-84).

Plaintiff began chiropractic treatments with Dr. Hull in August 2002. Plaintiff's treatment regimen included massage, diversified adjustments, ultrasound, electrical muscle stimulation, and moist heat. In a note dated November 11, 2002, Dr. Hull said that Plaintiff had played "full contact basketball"

the day before, for the first time in over a year. (Tr. 301). In a letter dated April 2, 2003, Dr. Hull noted that she had been treating plaintiff since August 19, 2002, for complications of two organ transplants. She said he suffers from chronic muscle fatigue due to the anti-rejection medication which "are a known toxin but are necessary to sustain life. Even though the patient does very well with treatment, it is a continual process that must be maintained in order to even control his compensatory symptoms from medications he must take every day." (Tr. 296).

Dr. Hull completed a medical questionnaire in August 2003. She indicated that plaintiff could walk for only one-half a block, sit for 45 minutes, and stand for 45 minutes at a time. Dr. Hull further indicated that plaintiff could sit for a total of less than two hours and stand and walk, in combination, for less than two hours in an eight-hour workday. He could occasionally lift less than 10 pounds and rarely lift 10 pounds and could never squat, crawl or climb ladders and only occasionally bend and climb stairs. Dr. Hull concluded plaintiff could never reach above shoulder level on either side and his condition would likely deteriorate if placed under stress. (Tr. 296-312, 317-20).

In a letter dated August 17, 2004, Dr. Hull noted she was "astounded" that plaintiff's Social Security claim may have been denied in part because of the statement she made in a note from November 2002. She stated, "I thoroughly read through the patient's notes from his initial visit to his final visit. I do not see anything in these notes that would indicate that the patient has ever improved from his condition or has done anything that would lead me to believe that he is able to work on a daily basis." She further stated that it is obvious from every note that he has "some type of pain somewhere. And I continually mention the fact that the anti-rejection medication that he has

to take for the remainder of his life, due to his organ transplant causes severe toxicity.  This type of toxicity inevitably will settle in the patient's soft tissue and cause him chronic fatigue and malaise."  She then stated, "No where else in the patient's notes from 8/19/02 to 11/4/03 does it mention that the patient had played basketball or done any other such activity other than the one time.  It is astounding to me that this patient's benefits were denied because of one good day, when I treated this patient for over a year with only minimal affect (sic) for his condition."  She concluded that plaintiff's condition had worsened over time and would continue to do so. (Tr. 341).

On July 30, 2002, plaintiff was examined by an orthopedic specialist, Dr. Wasielewski.  Plaintiff complained of pain in his hips, shoulders, knees, back, legs and feet as well as fatigue and problems sleeping.  He reported feelinig worse from the musculoskeletal perspective since his kidney transplant.  Dr. Wasielewski's diagnosis was fibromyalgia.  Plaintiff demonstrated tender points all over and had a significant amount of myalgia muscle pain.  Dr. Wasielewski opined that this could be medicine-related.  He informed Dr. Henry that he was unsure as to how to proceed with treatment.  He recommended Elavil, an anti-depressant, to allow plaintiff to sleep, and Flexeril, a muscle relaxer. (Tr. 313-315).

On December 3, 2003, plaintiff saw Dr. Davies, a transplant surgeon for follow up of his kidney/pancreas transplant.  She felt plaintiff's complaints of diffuse pain were consistent with fibromyalgia.  She decreased plaintiff's Norvasc in an attempt to decrease his swelling.  She prescribed Pravachol, a cholesterol medication which "has the least incidents of muscle pain." (Tr. 342-43).

In June and July 2004, plaintiff saw other physicians in Dr.

Lutmer's office. He complained of chronic back pain and depression. He was prescribed Oxycontin, an opiod analgesic medication, and was referred to a psychiatrist for underlying depression. (Tr. 347-48).

Records from Dr. Luther's office show that plaintiff developed symptoms of generalized fatigue, worsening cough, loss of appetite, and weakness. In addition, he had mild wheezing despite his use of inhalers. Due to his symptoms and a weight loss of 14 pounds over a period of four months, he was referred for a broad medical workup. Thereafter, plaintiff was referred to Dr. Tucker, a pulmonary specialist, who found left lower lobe pneumonia. Following a course of antibiotics, plaintiff improved. In September 2005, plaintiff presented with tinnitus in the left ear and appeared chronically ill. Due to his immune compromised status, he was treated empirically for infection. When he returned to Dr. Tucker, plaintiff was placed on Metoprolol, a beta blocker, to help circulation. Dr. Tucker also recommended further studies. (Tr. 444-72).

Plaintiff was evaluated at the Scioto Paint Valley Mental Health Center on August 9, 2004, due to depression. He told the evaluator he was, "tired of being sick all the time." His other complaints included having problems coping, dealing with his pain, and the side effects of medication. He was diagnosed with major depressive disorder, single episode and assigned a Global Assessment of Functioning of 51. He was referred for therapy. (Tr. 474-80).

On November 11, 2004, plaintiff told Dr. Jones that while he was still depressed at times, he still gets nerve-racked, but not as bad. He was focused on pain complaints. His affect was depressed. On December 29, 2004, he noted some days were not as bad, but some days are worse. He hated putting his family through this. He said, "I was never like this until I had my

transplant and had to take that medicine." He reported being unable to go out because of his immune system and the risk of developing pneumonia. He was seen on a monthly basis through January 2006 and observations revealed him to be moderately depressed and anxious. When last examined, his medications were changed. (Tr. 473, 511-12).

IV. The Medical and Vocational Experts

Dr. Snider, a medical expert, testified at the December 16, 2003 administrative hearing. He noted Plaintiff's documented impairments included diabetes mellitus type 1 with complications including peripheral neuropathy, severe retinopathy and bilateral cataracts resulting in poor peripheral vision; a kidney/pancreas transplant in 1996 and a reconstruction surgery in 2000; osteoporosis secondary to a steroid use resulting in a lot of bone pain, fibromyalgia, L4-5 myalgia and depression. (Tr. 69-71). Dr. Snider testified that plaintiff's impairments did not meet or equal any of the Listings of Impairments. (Tr. 71-72). He further testified that plaintiff would be restricted from working around unprotected heights, dangerous machinery, operating a vehicle in the work place, climbing ladders, ropes and scaffolds; would be restricted to working around no more than four to five other people; and should avoid excessive humidity and temperature extremes. He could not balance and could occasionally lift 15 pounds and frequently lift five to seven pounds. In an eight-hour day, "He could sit for six hours but he's got to have a lot of breaks. He's got to have a break at least every half hour to get up and move around." He could walk and stand for 15 minutes at a time, for a total of two hours a day. He could occasionally use foot controls because of his neuropathy. He would have difficulty reading complicated instructions and because of his depression, and an extremely stressful job would be problematic for him. (Tr. 72-73).

Dr. Snider testified that problems with memory and concentration could result from plaintiff's pain medication as well as his anti-rejection medication. (Tr. 74). After sitting for 30 minutes, plaintiff would have to move around for 10 to 15 minutes. Dr. Snider stated, "He could... lean over his bench and move around but I think fibromyalgia patients benefit from moving. They also have increased stiffness when they get up and move around but then that is alleviated." (Tr. 75).

Dr. Snider was asked to clarify whether plaintiff would have to be off task for 10 or 15 minutes. It was pointed out by plaintiff's counsel that he had gotten up from his seat and moved a couple of feet away and was walking around. Dr. Snider agreed that he would have to move in that manner. (Tr. 82).

Dr. Snider also testified as the medical expert at the February 2, 2006, administrative hearing. Dr. Snider testified that in regard to the impairments and limitations he discussed at the first hearing, plaintiff's severe depression was the principal impairment that he suffers from, "which I think is much more obvious this trip than the last. But physically, I see no reason to change that residual function capacity..." (Tr. 547). The Administrative Law Judge noted that the only real focus of the Appeals Council's review was the issue of plaintiff's need for a sit/stand option. (Tr. 547). The ALJ asked Dr. Snider to state specifically what would be required for the sit/stand option to which he previously testified. In response, Dr. Snider said the sit/stand option was "strictly for his [plaintiff's] comfort," that plaintiff's osteoporosis does not cause pain and that there was nothing in the literature to prove his chiropractor's opinion that toxins in his body from anti-rejection drugs are causing his pain. He felt the pain was either neuropathic or arthritic pain and therefore the sit/stand option was for his comfort so that he could get up and move

-10-

around. When the ALJ inquired what was "medically necessary" in terms of plaintiff's need for a sit/stand option, Dr. Snider responded that the sit/stand option was included so that he could get up and move around, and not be so stiff and sore, which would occur if he stayed in one position for a longer period of time. (Tr. 548). "If I had to put in one word, I'd say fibromyalgia." Id. Dr. Snider concluded that plaintiff should have the right to "get up and move around." (Tr. 550).

Finally, a vocational expert, Dr. Oestreich, also testified at both administrative hearings. At the first hearing, Dr. Oestreich characterized plaintiff's past jobs as sedentary and skilled. (Tr. 78). He was asked to assume that plaintiff had the limitations identified by Dr. Snider along with work around large numbers of people would be contraindicated. With those restrictions, plaintiff could not perform his past work but could perform 20 to 25% of the 75,000 sedentary, unskilled jobs in the State of Ohio, such as a telephone information clerk, hand packer and file clerk. Plaintiff could also perform 20 to 25% of the 1,000 sedentary, unskilled jobs in his local area. (Tr. 79). Based upon Plaintiff's testimony, there is no work he could perform. (Tr. 81). When questioned by plaintiff's counsel, Dr. Oestrich said that if the individual performing the job had to be up 10 to 15 minutes after sitting for 30 minutes and had to walk around during that time, there is no work he could perform. (Tr. 82).

At the second administrative hearing, Dr. Oestrich offered similar testimony. He agreed that if, when plaintiff took a break every thirty minutes to move around, he was off task for fifteen minutes, he could not do even the small number of jobs which he identified. (Tr. 556-557). However, Dr. Snider then clarified that in his opinion, there was no medical necessity for plaintiff to be off task for that long a time whenever he took a

-11-

break, and that he could do the jobs described by Dr. Oesterlich in the manner that Dr. Oesterlich specified.

### V.   The Commissioner's Decision

Based on the above evidence, the Commissioner found that plaintiff suffered from severe impairments including diabetes mellitus, peripheral neuropathy, retinopathy, bilateral cataracts, osteoporosis, hypertension, fibromyalgia, left femoral bypass, L4-5 meralgia, gastoesophageal reflux disease, major depression, chronic arcotic usage, status post kidney and pancreas transplant and reconstruction and status post virectomy of the eyes.  As a result of these impairments, plaintiff retained the residual functional capacity to perform sedentary work with the following restrictions: lift and carry 15 pounds occasionally and five to seven pounds frequently.  He could sit up to six hours in an eight-hour workday but should be allowed to get up and change position every 30 minutes, while remaining on task.  Plaintiff is able to stand and walk for 15 minutes at a time for a combined total of two hours in an eight-hour workday.  Plaintiff is precluded from climbing ladders, ropes, and scaffolds, balancing, and working around unprotected heights, moving machinery and hazards.  He cannot work in exposure to extremes of temperature and humidity or perform work requiring peripheral vision.  The Administrative Law Judge noted that plaintiff is unable to perform detailed or complex tasks or work in an environment that involves interaction with large numbers of people (defined as more than four or five).  Because the vocational expert identified a number of jobs that plaintiff could perform with those limitations, he was found not to be disabled.

### VI.  Legal Analysis

In his statement of errors, plaintiff raises one issue.  He argues that the Commissioner erred in finding that the extreme

limitations caused by his numerous severe impairments would still allow him to perform a limited range of sedentary work. This contention is evaluated under the following standard.

    <u>Standard of Review</u>. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (<u>quoting</u> <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" *Id.* <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976). The Secretary's findings of fact must be based upon the record as a whole. <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Secretary's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (<u>quoting</u> <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Secretary's decision must be affirmed so long as his determination is supported by substantial evidence. <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

    In his statement of errors, plaintiff makes a very limited argument in support of reversal. He acknowledges that Dr. Oesterlich testified that 20-25% of the unskilled sedentary jobs could be performed by someone who needed the option to stand and move around for a short time every half hour, and that Dr. Snider

testified that he did not need to be off task for fifteen minutes at a time when he took his breaks.  However, he claims that the Commissioner ignored Social Security Ruling 83-12 by finding that he could perform the jobs identified by Dr. Oesterlich.  That ruling states that unskilled sedentary jobs do not allow a worker "ordinarily" to sit or stand at will.  Plaintiff thus argues that "even with the limitations given by Dr. Snider, Mr. Rigsby would not be able to perform the limited number of jobs listed by the vocational expert."  Plaintiff's Statement of Errors, Doc. #16-2, at 18-19.

As the Commissioner correctly points out, however, and as the cases hold, that ruling does not mandate a finding of disabled in every case where a claimant can perform only unskilled sedentary work and requires a sit/stand option. See Martinez v. Heckler, 807 F.2d 771 (9th Cir. 1986).  Rather, the express language of the ruling states that "[i]n cases of unusual limitation on ability to sit or stand, a VS [vocational specialist] should be consulted to clarify the implications for the occupational base."  SSR 83-12, 1983 WL 31253, *4.  As noted in Bryant v. Astrue, 2009 WL 2134138, *4 (E.D. Ky. July 15, 2009), "the ruling merely indicates that the testimony of a vocational expert is required to consider the issue."  When such an expert is consulted, absent compelling reasons to doubt that expert's testimony, the Commissioner is "entitled to rely on the VE's" opinion about the claimant's ability to perform substantial gainful activity even when a sit/stand option is required.  Walls v. Barnhart, 296 F.3d 287, 292 (4th Cir. 2002).

Plaintiff is essentially asking this Court to disbelieve Dr. Oesterlich's testimony, or to hold that no reasonable person could have relied upon it in reaching the conclusions which the Commissioner reached about plaintiff's vocational abilities. Under the deferential standard of review applicable here, the

-14-

Court simply may not reach that conclusion. Therefore, it is required to affirm the Commissioner's decision denying benefits.

## VII. Recommended Disposition

For the foregoing reasons, it is recommended that the plaintiff's statement of error be overruled and that judgment be entered in favor of the defendant Commissioner.

## VIII. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within ten (10) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge